UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

| | |
|---|---|
| NML CAPITAL, LTD., <br><br>          Plaintiff-Appellee, <br><br>     v. <br><br> REPUBLIC OF ARGENTINA, <br><br>          Defendant-Appellant. | No. 14-4134-cv |
| NML CAPITAL, LTD., <br><br>          Plaintiff-Appellee, <br><br>     v. <br><br> REPUBLIC OF ARGENTINA, <br><br>          Defendant-Appellant. | No. 14-4143-cv |
| AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., <br><br>          Plaintiffs-Appellees, <br><br>     v. <br><br> REPUBLIC OF ARGENTINA, <br><br>          Defendant-Appellant. | No. 14-4145-cv |

*(captions continue on following pages)*

**THE REPUBLIC OF ARGENTINA'S OPPOSITION
TO PLAINTIFFS' MOTION TO DISMISS**

NML CAPITAL, LTD.,

               Plaintiff-Appellee,

   v.

                                      No. 14-4147-cv

REPUBLIC OF ARGENTINA,

               Defendant-Appellant.

PABLO ALBERTO VARELA, LILA INES
BURGUENO, MIRTA SUSANA DIEGUEZ,
MARIA EVANGELINA CARBALLO,
LEANDRO DANIEL POMILIO, SUSANA
AQUERRETA, MARIA ELENA CORRAL,
TERESA MUNOZ DE CORRAL, NORMA
ELSA LAVORATO, CARMEN IRMA
LAVORATO, CESAR RUBEN VAZQUEZ,
NORMA HAYDEE GINES, MARTA
AZUCENA VAZQUEZ,

               Plaintiffs-Appellees,

   v.

REPUBLIC OF ARGENTINA,

               Defendant-Appellee.

No. 14-4148-cv

AURELIUS OPPORTUNITIES FUND II, LLC , AURELIUS CAPITAL MASTER, LTD.,

                  Plaintiffs-Appellees,

     v.

REPUBLIC OF ARGENTINA,

                  Defendant-Appellant.

No. 14-4150-cv

---

AURELIUS CAPITAL MASTER, LTD., AURELIUS OPPORTUNITIES FUND II, LLC,

                  Plaintiffs-Appellees,

     v.

REPUBLIC OF ARGENTINA,

                  Defendant-Appellant.

No. 14-4152-cv

---

AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD.,

                  Plaintiffs-Appellees,

     v.

REPUBLIC OF ARGENTINA,

                  Defendant-Appellant.

No. 14-4161-cv

AURELIUS CAPITAL MASTER, LTD.,
AURELIUS OPPORTUNITIES FUND II,
LLC,

          Plaintiffs-Appellees,

    v.

REPUBLIC OF ARGENTINA,

          Defendant-Appellant.

No. 14-4167-cv

AURELIUS CAPITAL MASTER, LTD.,
AURELIUS OPPORTUNITIES FUND II,
LLC,

          Plaintiffs-Appellees,

    v.

REPUBLIC OF ARGENTINA,

          Defendant-Appellant.

No. 14-4175-cv

BLUE ANGEL CAPITAL I LLC,

          Plaintiff-Appellee,

    v.

REPUBLIC OF ARGENTINA,

          Defendant-Appellant.

No. 14-4190-cv

BLUE ANGEL CAPITAL I LLC

                Plaintiff-Appellee,

    v.

REPUBLIC OF ARGENTINA,               No. 14-4193-cv

                Defendant-Appellant.

OLIFANT FUND LTD.,

                Plaintiff-Appellee,

    v.                               No. 14-4213-cv

REPUBLIC OF ARGENTINA,

                Defendant-Appellant.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................1

BACKGROUND ..............................................................................2

ARGUMENT ...................................................................................8

I.   THE COURT HAS JURISDICTION TO HEAR THE APPEAL PURSUANT TO THE COLLATERAL ORDER DOCTRINE....................8

II.   THE COURT HAS JURISDICTION TO HEAR THE APPEAL PURSUANT TO 28 U.S.C. § 2201 .........................................................10

III.  THE REPUBLIC'S APPEAL IS MERITORIOUS ......................................12

    A.   The Order Was A Denial Of The Republic's Sovereign Immunity....13

    B.   The Order Is Otherwise Improper ........................................................15

CONCLUSION ..............................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Af-Cap, Inc., v. Republic of Congo*,
462 F.3d 417 (5th Cir. 2006) .......................................................... 17

*Armstrong v. Guccione*,
470 F.3d 89 (2d Cir. 2006)............................................................. 17

*Aurelius Capital Partners, LP v. Republic of Argentina*,
584 F.3d 120 (2d Cir. 2009)............................................................ 7

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964) ................................................................... 13-14

*Blue Ridge Invs., L.L.C. v. Republic of Argentina*,
735 F.3d 72 (2d Cir. 2013)............................................................. 8

*Burlington Northern & Santa Fe Railway Co. v. Vaughn*,
509 F.3d 1085 (9th Cir. 2007) ......................................................... 10

*EM Ltd. v. Republic of Argentina*,
131 F. App'x 745 (2d Cir. 2005) ..................................................... 3, 8

*EM Ltd. v. Republic of Argentina*,
473 F.3d 463 (2d. Cir. 2007)........................................................... 8

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
665 F.3d 384 (2d Cir. 2011)............................................................ 8

*H.W. Urban GmbH v. Republic of Argentina*,
No. 02 Civ. 5699 (TPG), 2003 WL 21058254 (S.D.N.Y. May 12, 2003) ..... 3

*Hickory Secs. Ltd. v. Republic of Argentina,*
493 F. App'x 156 (2d Cir. 2012) ..................................................... 7

*Lightwater Corp. v. Republic of Argentina*,
No. 02 Civ. 3804 (TPG), 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003) ....... 2

**Page(s)**

*NML Capital, Ltd. v. Banco Central de la República Argentina*,
652 F.3d 172 (2d Cir. 2011), *cert. denied sub. nom*, *EM Ltd. v. Republic of Argentina*, 133 S. Ct. 23 (2012) ...................................................................... 7

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
109 F.3d 850 (2d Cir. 1997)............................................................... 3

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
506 U.S. 139 (1993).......................................................................... 10

*Republic of Argentina v. NML Capital, Ltd.*,
134 S. Ct. 2819 (2014) ..................................................................... 5

*Rossini v. Republic of Argentina*,
453 F. App'x 22 (2d Cir. 2011) ........................................................ 7

*Seijas v. Republic of Argentina*,
606 F.3d 53 (2d Cir. 2010) ............................................................... 7

*Seijas v. Republic of Argentina*,
502 F. App'x 19 (2d Cir. 2012) ........................................................ 7

*Swarna v. Al-Awadi*,
622 F.3d 123 (2d Cir. 2010).............................................................. 13

*Thermice Corp. v. Vistron Corp.*,
832 F.2d 248 (3d Cir. 1987).......................................................... 11, 12

*United States v. Johnson*,
801 F.2d 597 (2d Cir. 1986)............................................................. 8

*USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*,
681 F.3d 103 (2d Cir. 2012).............................................................. 8

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*,
493 U.S. 400 (1990)...................................................................... 13, 15

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
296 F.3d 1154 (D.C. Cir. 2002) ........................................................ 13

iii

**Page(s)**

**Rules and Statutes**

28 U.S.C. § 1330(a) ........................................................ 13

28 U.S.C. § 1604 ........................................................... 13

28 U.S.C. § 1609 ........................................................... 16

28 U.S.C. § 2201 ..................................................... *passim*

2d Cir. R. 31.2(a)(3) ...................................................... 8

**Other Authorities**

15B Wright & Miller, Fed. Prac. & Proc. Juris. § 3917 (2d ed.).................... 11

15B Wright & Miller, Fed. Prac. & Proc. Juris. § 3915.2 (2d ed.)................ 11

Brief for the United States as *Amicus Curiae* in Support of Reversal, *NML Capital, Ltd. v. Republic of Argentina*,
No. 12-105-cv(L), 2012 WL 1150791 (2d Cir. Apr. 4, 2012)....................... 3

Brief for the United States of America as *Amicus Curiae* in Support of Partial Reversal, *SerVaas Inc. v. Mills*,
No. 14-385, 2014 WL 4656925 (2d Cir. Sept. 9, 2014) ............................... 15

Report of the International Law Commission to the General Assembly on the work of its 38th Session,
[1986] 2 Y.B. Int'l L. Comm'n 1, U.N. Doc. A/CN.4/SER.A/1986/Add.l.... 15

Statement of Interest of the United States, *Macrotecnic Int'l Corp. v. Republic of Argentina*,
No. 02 Civ. 5932 (TPG), 2004 WL 5475206 (S.D.N.Y. Jan. 12, 2004) ....... 3

United Nations (U.N.) Convention on Jurisdictional Immunities of States and Their Property,
44 I.L.M. 803, 811 (2005) .......................................................... 14

The Republic of Argentina (the "Republic") respectfully opposes plaintiffs' motion to dismiss the above-captioned appeals ("Motion") pursuant to Rule 27(a)(3) of the Federal Rules of Appellate Procedure.

## INTRODUCTION

This is an appeal from the district court's October 3, 2014 order holding the Republic in contempt of court for proposing and enacting legislation in the Argentine National Congress (the "Order") (Ex. A), and from underlying orders in which the district court characterized as "illegal" and "prohibited" speeches, newspaper advertisements, and payments the Republic was contractually obligated to make to third parties. Plaintiffs' Motion is a transparent attempt to conflate the Court's jurisdiction to hear this appeal with the appeal's merits, and so preclude proper briefing and argument on this unprecedented Order – which held the Republic in contempt for the quintessentially sovereign act of passing a law pursuant to its democratic process. Whether the Order violates the Republic's sovereign immunity is a question the Court will answer *after* briefing and argument on the merits, not on plaintiffs' Motion, which must be denied.

*First*, under black-letter law, the Court has jurisdiction over this appeal under the collateral order doctrine because the district court's Order was a denial of jurisdictional immunity conferred on the Republic by the Foreign Sovereign Immunities Act ("FSIA"). Plaintiffs do not seriously contest that denial

of a foreign state's jurisdictional immunity is immediately appealable, nor could they.  Instead, plaintiffs erroneously claim that the Republic "does not assert [its immunity] here."  Motion at 12.  But the Republic *did* assert its immunity before the district court, and it will do so again in its opening brief in this appeal.

*Second*, although the district court styled the Order as a contempt order, it is, at least in part, a declaratory judgment, ruling that various proposals, if carried out, or powers, if exercised, *would violate* the district court's injunctions. *See, e.g.*, Hr'g Tr. 15:23-25, Sept. 29, 2014 ("Sept. 29 Hr'g Tr.") (Ex. B) ("It seems to me there's a very concrete proposal to – that would clearly violate the injunction.").  As a declaratory judgment, the Order is appealable pursuant to 28 U.S.C. § 2201.

For each of these reasons, the Court has jurisdiction to hear this appeal, and the Motion must accordingly be denied.

## BACKGROUND

Plaintiffs, primarily hedge funds that specialize in purchasing and suing on defaulted sovereign debt, commenced litigation against the Republic in the wake of the "worst economic crisis in its history."  *Lightwater Corp. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2003 WL 1878420, at *2 (S.D.N.Y. Apr. 14, 2003).  By the end of 2001, the Republic could not service its overwhelming debt burden while maintaining basic governmental services

2

necessary for the health, welfare, and safety of the Argentine population.

Faced with an unmanageable financial crisis, a foreign state, unlike a private borrower, cannot invoke the protection of a bankruptcy regime, and instead must seek to restructure its external debt on an entirely voluntary basis. Consistent with international norms and United States policy,[1] the Republic engaged in two global exchange offers in 2005 and 2010 (the "Exchange Offers"). *See EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005) (summary order) (noting that the successful conclusion of the Republic's 2005 "[debt] restructuring [was] obviously of critical importance to the economic health

---

[1]     The United States, the international financial community, and the federal courts have all recognized the importance of voluntary sovereign debt restructuring.  *See, e.g.*, Brief for the United States as *Amicus Curiae* in Support of Reversal, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105-cv(L), 2012 WL 1150791, at **6-10 (2d Cir. Apr. 4, 2012); Statement of Interest of the United States, *Macrotecnic Int'l Corp. v. Republic of Argentina*, No. 02 Civ. 5932 (TPG), 2004 WL 5475206, at **2-6 (S.D.N.Y. Jan. 12, 2004); *H.W. Urban GmbH v. Republic of Argentina*, No. 02 Civ. 5699 (TPG), 2003 WL 21058254, at *2 (S.D.N.Y. May 12, 2003) ("[A]n important channel for attempting to resolve the Argentine debt problem will undoubtedly be the effort to negotiate a debt restructuring plan."); *cf. Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 109 F.3d 850, 855 (2d Cir. 1997) ("[T]he United States encourages participation in, and advocates the success of, IMF foreign debt resolution procedures."). Recently, the United Nations General Assembly reaffirmed international practice by passing a resolution, supported by 124 nations, to "adopt through a process of intergovernmental negotiations . . . a multilateral legal framework for sovereign debt restructuring processes with a view . . . to increasing the efficiency, stability and predictability of the international financial system." G.A. Res. 68/304, ¶ 5, U.N. Doc. A/RES/68/304 (Sept. 17, 2014) (ECF No. 684-1). (All references to ECF Nos. refer to the docket in *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978.)

of a nation"). The restructuring included bonds governed by a 1994 Fiscal Agency Agreement ("FAA Bonds"), certain of which plaintiffs own. Holders of approximately 92% of the Republic's debt chose to participate in the restructuring, exchanging their FAA bonds for new, performing bonds ("Exchange Bonds").

Plaintiffs elected not to participate in the Republic's Exchange Offers. Instead, they brought a series of actions against the Republic seeking full principal and interest on their bonds, notwithstanding that they purchased almost all of these bonds for pennies on the dollar and that the overwhelming majority of the Republic's creditors accepted lower interest rates and reduced principal to enable the Republic to escape from economic collapse and recommence payments to its creditors. *Cf.* Gordon Brown (former United Kingdom Prime Minister), Speech at the United Nations (May 10, 2002) (describing holdout creditor litigation as "morally outrageous"). Among other tactics, plaintiffs encouraged the district court to interpret a clause in the 1994 Fiscal Agency Agreement ("1994 FAA") – the so-called "*pari passu*" clause – to require the Republic to pay them all past due principal and interest in full any time the Republic sought to make a payment to the holders of the Exchange Bonds. The district court entered unprecedented injunctions (the "Injunctions") to this effect on February 23, 2012. Order, Feb. 23, 2012 (ECF No. 425). After two appeals to this Court in which the Court affirmed the rulings of the district court, the Supreme Court denied the Republic's

4

petition for *certiorari* on June 16, 2014. *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2819 (2014). Two days later, the stay of the Injunctions terminated, and they took effect.

On September 24, 2014, plaintiffs moved to hold the Republic in contempt and to impose sanctions, principally on the ground that the Republic's Sovereign Payment Law No. 26,984 (the "Sovereign Payment Law") (ECF No. 678-38), which authorizes the Republic's Ministry of the Economy to take steps to remove the Bank of New York Mellon ("BNYM") as Trustee for the Exchange Bonds and to appoint Nación Fideicomisos S.A. in its place, allegedly violated the Injunctions. Plaintiffs also reiterated a host of allegations from a series of earlier filings below, including that political speeches made by the Republic's elected officials and newspaper advertisements purchased by the Republic as a means to communicate with its creditors both violated the Injunctions. The Republic opposed plaintiffs' motion on several grounds, arguing, *inter alia*, that "[d]ecisions of the central political organs of the Argentine State (including statements by the head of the Argentine Executive Branch or by members of her Cabinet, as well as laws enacted by the Legislative Branch) constitute sovereign acts *and are therefore beyond the Court's jurisdiction*." Mem. of the Republic of Argentina in Opp'n to Pls' Mot. To Hold Argentina in Civil Contempt ("Republic Opp.") (ECF No. 685) at 9 (emphasis supplied).

5

At a hearing held the same day the Republic filed its opposition to plaintiffs' Motion, the district court ruled the Republic was in contempt of court. Sept. 29 Hr'g Tr. (Ex. B). During the hearing, the district court focused on the Sovereign Payment Law, making "a very clear holding that the proposals are illegal" and asserting that the Republic's "proposed steps" to alter the payment system "are illegal and cannot be carried out." *Id.* at 27:16-28:1; *see also id.* at 15:17-25 ("[A]s I understand it what is proposed is to displace the indenture trustee and appoint somebody in Buenos Aires and that that party, that official will then pay the interest due to the exchanges of 2005 and 2010 without any recognition of the nonexchanges and so forth. That's the problem. . . . It seems to me there's a very concrete proposal to – that would clearly violate the injunction.").[2] The district court so held even though the Sovereign Payment Law did not alter the payment process on the Exchange Bonds, but only *authorized* the Ministry of Economy to take steps to remove BNYM as trustee of the Exchange Bonds, *see, e.g.*, *id.* at 16:7-11 (BNYM informed the Republic that it "remain[ed]" – and continues to remain – "as trustee."); *id.* at 17:3-6 (any changes permitted to the

---

[2] The district court also questioned the process by which the Sovereign Payment Law was passed, in effect critiquing the workings of the Argentine political process, Sept. 29 Hr'g Tr. at 27:12-15 (Ex. B) ("But let me say this. The legislation is not something that sprung from the national congress. What we're talking about is proposals and changes and actions that come from the executive branch of the Republic of Argentina.").

payment system on Exchange Bonds by the Sovereign Payment Law were "in futuro"), and entered an order to that effect. Order, Sept. 29, 2014 (ECF No. 687).

The district court confirmed its holding on October 3, 2014, entering the Order and requiring the Republic to "reverse entirely" any action that had contributed to the finding of contempt, "including, but not limited to, re-affirming the role of [BNYM] as the indenture trustee and withdrawing any purported authorization of Nación Fideicomisos S.A. to act" in its place.[3] Order at 3 (Ex. A). The Republic timely appealed from the Order on November 3, 2014.[4] Plaintiffs

---

[3]     The Order and record are ambiguous as to which acts or combination of acts, other than the passage of the Sovereign Payment Law, the district court found to constitute contempt. In light of that ambiguity, and plaintiffs' serial allegations since the Supreme Court's denial of *certiorari*, the Republic also appeals from the orders and rulings from the bench underlying or associated with the Order. *See* Order, June 20, 2014 (ECF No. 527); Order, Aug. 6, 2014 (ECF No. 633); Hr'g Tr., Aug. 8, 2014 (ECF No. 646); Hr'g Tr., Aug. 21, 2014 (ECF No. 657).

[4]     Plaintiffs argue irrelevantly and at length that the Republic has too often appealed to this Court. Motion at 16-17. In fact, the Republic only has three pending appeals, two of which are before the Court pursuant to orders granting the Republic permission to appeal under Rule 23(f) of the Federal Rules of Civil Procedure. Order, *Seijas v. Republic of Argentina*, No. 14-1444 (2d Cir. June 18, 2014); Order, *Brecher v. Republic of Argentina*, No. 14-3409 (2d Cir. Nov. 25, 2014). The Republic is of course entitled to invoke its appellate rights, which have in fact allowed it to vindicate otherwise correct legal positions. *See, e.g.*, *Seijas v. Republic of Argentina*, 502 F. App'x 19 (2d Cir. 2012) (summary order); *Hickory Secs. Ltd. v. Republic of Argentina*, 493 F. App'x 156 (2d Cir. 2012) (summary order); *NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172 (2d Cir. 2011), *cert. denied sub. nom*, *EM Ltd. v. Republic of Argentina*, 133 S. Ct. 23 (2012); *Rossini v. Republic of Argentina*, 453 F. App'x 22 (2d Cir. 2011) (summary order); *Seijas v. Republic of Argentina*, 606 F.3d 53 (2d Cir. 2010); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120 (2d. Cir.

filed the Motion on February 12, 2015, and the Republic's opening brief deadline

is tolled pending the Motion's resolution.  2d Cir. R. 31.2(a)(3).

## ARGUMENT

## I.    THE COURT HAS JURISDICTION TO HEAR THE APPEAL PURSUANT TO THE COLLATERAL ORDER DOCTRINE

The law is well-established that under the collateral order doctrine this

Court has jurisdiction to entertain appeals from the denial of sovereign immunity

from the jurisdiction of U.S. Courts.  *See Blue Ridge Invs., L.L.C. v. Republic of*

*Argentina*, 735 F.3d 72, 80 (2d Cir. 2013) (district court's "determination that

[defendant] waived its foreign sovereign immunity [pursuant to the implied waiver

exception]" appealable under collateral order doctrine); *USAA Cas. Ins. Co. v.*

*Permanent Mission of Republic of Namibia*, 681 F.3d 103, 107 (2d Cir. 2012)

(order denying motion to dismiss on sovereign immunity grounds immediately

appealable under collateral order doctrine); *Figueiredo Ferraz E Engenharia de*

*Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 388 (2d Cir. 2011) (denial of

foreign sovereign immunity appealable order under collateral order doctrine); *see*

*also United States v. Johnson*, 801 F.2d 597, 600 (2d Cir. 1986) (contempt order

denying claim of immunity immediately appealable).

---

2009); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d. Cir. 2007); *EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005) (summary order). The kind of name calling that plaintiffs indulge in adds nothing to the dignity of the appellate process.

This black-letter law permits the Court to hear the Republic's appeal and requires the denial of plaintiffs' Motion. Plaintiffs, who do not because they cannot dispute that a denial of sovereign immunity is immediately appealable, argue only that the Republic somehow "does not asset" its immunity here, Motion at 12, and otherwise contest the Republic's immunity claim *on the merits*. Motion at 13-16. These arguments fail.

*First*, plaintiffs' assertion that the Republic "has waived and does not assert here," Motion at 12, its jurisdictional immunity is demonstrably false. In opposition to plaintiffs' motion in the district court, the Republic repeatedly argued that the district court did not have jurisdiction to adjudicate the legality of the Argentine National Congress's passage of the Sovereign Payment Law or the contents of a political speech. *See* Republic Opp. (ECF No. 685) at 4 ("Contempt would be particularly offensive to international law and practice on this record, given plaintiffs' demand that the Republic be punished for statements by political officials, domestic laws, and other occurrences *over which this Court lacks jurisdiction*.") (emphasis supplied); *id*. at 9 ("Decisions of the central political organs of the Argentine State . . . constitute sovereign acts *and are therefore beyond the Court's jurisdiction*.") (emphasis supplied); *id*. at 3 ("Here, the Republic did not consent to subjecting its sovereign acts, including its internal governance and relationships with third parties, to attacks by creditors in

commercial disputes in the United States.").  There is thus no basis for plaintiffs'

claim that the Republic did not assert jurisdictional immunity.

      *Second*, plaintiffs' contention that the Republic will not ultimately

succeed on its immunity claim, to which a significant portion of their brief is

devoted, Motion at 12-17, is irrelevant to the question before the Court:  whether

appellate jurisdiction exists.  *See Burlington Northern & Santa Fe Railway Co. v.*

*Vaughn*, 509 F.3d 1085, 1091 (9th Cir. 2007) ("The fact that the district court

applied settled law to determine whether immunity barred [plaintiff's] suit does not

prevent interlocutory review."); *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf &*

*Eddy, Inc.*, 506 U.S. 139, 148 (1993) (Blackmun, J., concurring) ("I concur in the

Court's opinion and judgment that, regardless of the merits, a district court's denial

of a claim of immunity under the Eleventh Amendment should be appealable

immediately.").  The Court should reject plaintiffs' baseless attempt to collapse the

merits of this appeal into a motion to dismiss for lack of jurisdiction, and in so

doing prevent this Court from adjudicating the district court's unprecedented Order

on a full record.

## II.    THE COURT HAS JURISDICTION TO HEAR THE APPEAL PURSUANT TO 28 U.S.C. § 2201

      Separate and apart from the collateral order doctrine, this Court also

has jurisdiction over the Republic's appeal under 28 U.S.C. § 2201, because the

Order is in part forward-looking in nature and therefore equivalent to an

immediately appealable declaratory judgment.   *See* 28 U.S.C. § 2201(a) ("Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.").[5]  Here, the contempt Order plainly constitutes an appealable declaratory judgment because it declares that future conduct by a party would violate the district court's underlying Injunctions.  *See* 15B Wright & Miller, Fed. Prac. & Proc. Juris. § 3917 (2d ed.) (if a judgment of contempt "is sought essentially as a declaratory judgment, however, the declaration may be final without the need to await disobedience and actual contempt sanctions"); *see also Thermice Corp. v. Vistron Corp.*, 832 F.2d 248, 251 (3d Cir. 1987) (contempt order appealable as a declaratory judgment where it determined that as-yet untaken actions would violate the underlying order and did not impose sanctions).

　　　　Just as in *Thermice*, the Order on appeal, including the district court's ruling from the bench incorporated therein, Order at 3 (Ex. A), sets forth the district court's view that the Republic's "proposed steps" *would be* illegal *if* consummated at some future time.  *See, e.g.*, Sept. 29 Hr'g Tr. at 27:16-28:1 (Ex. B) (the Republic's "*proposed* steps" to alter the payment system "are illegal and *cannot be carried out*") (emphasis supplied); *id*. at 15:17-25 ("It seems to me there's a very concrete *proposal* to – that *would clearly violate* the injunction.")

---

[5]　　Exercising appellate jurisdiction over a declaratory judgment is particularly appropriate where, as here, "declaratory determinations are made in the course of protracted litigation aimed at controlling important institutions, enterprises, or situations."  15B Wright & Miller, Fed. Prac. & Proc. Juris. § 3915.2 (2d ed.).

11

(emphasis supplied). Moreover, plaintiffs concede that the same is true of the district court's June 20 order finding the Ministry of Economy's speech in violation of the Injunctions. *See id*. at 4:10-12 ("You responded promptly, your Honor, and issued a direction that said any such steps *would be an evasion* of this Court's order and *must not happen*.") (emphasis supplied); *id*. at 4:21-23 ("Your Honor, you issued an order right after that statement that said any such plan *would be a violation* of the amended February 23 order.").

Contrary to plaintiffs' assertion, Motion at 7, the absence of sanctions in the Order does not deprive the Court of jurisdiction, but rather, as in *Thermice*, supports the Republic's position that it is in part a declaratory judgment. *Thermice Corp.*, 832 F.2d at 251. The district court presumably did not impose sanctions at least in part because the Republic has not acted in a way that damages the plaintiffs. To the contrary, the Injunctions have functioned exactly as intended and have prevented holders of Exchange Bonds from receiving payment. Thus, the Order, although styled in terms of civil contempt, is largely a declaration that, if the Republic were to take certain actions in the *future*, those actions would violate the Injunctions. *Id.*

## III.    THE REPUBLIC'S APPEAL IS MERITORIOUS

Though it is premature to discuss the merits of this appeal, as plaintiffs have done, Motion at 13-16, the merits, as the Republic will

demonstrate at greater length in its opening brief, weigh strongly in favor of a finding that the district court erred by entering the Order and thereby denying the Republic's immunity claim.

**A.    The Order Was A Denial Of The Republic's Sovereign Immunity**

The Republic is a foreign state presumptively immune from the jurisdiction of U.S. courts.  28 U.S.C. §§ 1330(a), 1604; *see also Swarna v. Al-Awadi*, 622 F.3d 123, 143 (2d Cir. 2010).  Plaintiffs argue that the Republic waived its sovereign immunity, Motion at 12, but waivers of sovereign immunity must be narrowly construed, *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) ("In general, explicit waivers of sovereign immunity are narrowly construed in favor of the sovereign and are not enlarged beyond what the language requires") (internal quotation marks omitted), particularly where, as here, the waiver is explicitly limited to particular proceedings.  1994 FAA at A-18-A-19 (ECF No. 743-35).  The Republic's limited waiver in the 1994 FAA plainly did not confer on the district court the power to exercise general jurisdiction over the validity of the Republic's sovereign acts made within its own territory.  *See W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990) ("in the process of deciding [cases and controversies], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid"); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398,

401(1964) (U.S. courts are precluded "from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory").

Nor did it give the district court jurisdiction to adjudicate the legality of the Argentine National Congress's passage of a law or a speech by the President of the Republic.

To the contrary, U.S. foreign relations law, as espoused by the United States Executive in conformity with international law, does not give U.S. courts the power to pass upon the sovereign acts of foreign states in their own territory, much less issue contempt orders addressed to such sovereign acts. As the United States has stated:

> The United Nations Convention [on Jurisdictional Immunities of States and Their Properties, G.A. Res. 59/38, annex, art. 24(a), U.N. Doc. A/RES/59/38 (Dec. 2, 2004)] is not yet in force, and the United States is not a signatory to the Convention. Nevertheless, a number of its provisions, including Article 24(1),[6] generally reflect current international norms and practices regarding foreign state immunity. Notably, the principle reflected in Article 24 of the Convention was uniformly supported by member states, which disagreed only about whether to extend even further a state's immunity from coercion.

---

[6] Article 24(1) states, "Any failure or refusal by a State to comply with an order of a court of another State enjoining it to perform or refrain from performing a specific act or to produce any document or disclose any other information for the purposes of a proceeding shall entail no consequences other than those which may result from such conduct in relation to the merits of the case. In particular, no fine or penalty shall be imposed on the State by reason of such failure or refusal." 44 I.L.M. 803, 811 (2005).

*See* Brief of the United States as *Amicus Curiae* in Support of Defendant

Appellant at 15, *Af-Cap, Inc. v. Republic of Congo*, No. 05-51168 (5th Cir. Mar.

10, 2006) (ECF No. 684-1); *see also* Report of the International Law

Commission to the General Assembly on the work of its 38th Session, [1986]

2 Y.B. Int'l L. Comm'n 1, U.N. Doc. A/CN.4/SER.A/1986/Add.l (ECF

No. 684-2).[7]

### B.     The Order Is Otherwise Improper

Beyond its improper denial of immunity, the Order is otherwise

procedurally and substantively flawed.

*First*, the act of state doctrine precluded the district court from

holding the Republic in contempt for decisions of the central political organs of the

Argentine State, including laws enacted by the Argentine National Congress and

statements by the head of the Argentine Executive Branch and by members of her

Cabinet.  *W.S. Kirkpatrick & Co.*, 493 U.S. at 409 (It is black-letter law that the act

of state doctrine "requires that, in the process of deciding [cases and

controversies], the acts of foreign sovereigns taken within their own jurisdictions

shall be deemed valid.").  The district court violated the act of state doctrine by

---

[7]     *See also* Brief of the United States as *Amicus Curiae* in Support of Appellant at 7-14, *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, No. 10-7046 (D.C. Cir. Oct. 7, 2010) (ECF No. 684-1); Brief for the United States of America as *Amicus Curiae* in Support of Partial Reversal, *SerVaas Inc. v. Mills*, No. 14-385, 2014 WL 4656925, at *23 (2d Cir. Sept. 9, 2014).

accepting plaintiffs' invitation to declare invalid the Sovereign Payment Law, which was duly introduced to and enacted by the democratically-elected Argentine National Congress. The Sovereign Payment Law provides that the Republic's Ministry of the Economy shall have the authority to take steps to remove BNYM as Trustee for the Exchange Bonds and to appoint Nación Fideicomisos S.A. in its place. Sovereign Payment Law, art. 3 (ECF No. 679-38). Ruling from the bench, the district court held that "the proposal to displace the indenture trustee" was "illegal and cannot be carried out." Sept. 29 Hr'g Tr. at 27:18, 27:25-28:1 (Ex. B). It is difficult to imagine a clearer violation of the act of state doctrine: the Republic under its own constitution and laws in its own national territory conferred authorization to act on one of its Ministries, and the district court purported to rule that the Ministry was *not* permitted to act. *Id.*

     *Second*, the district court should not have entered the Order because it is unenforceable. The FSIA provides the sole, comprehensive scheme for jurisdiction and enforcement against foreign sovereigns in U.S. civil litigation. *Af-Cap, Inc.*, *v. Republic of Congo*, 462 F.3d 417, 428 (5th Cir. 2006). Under the FSIA, a foreign state's property is "immune from attachment arrest and execution except as provided in sections 1610 and 1611." 28 U.S.C. § 1609. Because these provisions do not permit the enforcement of contempt sanctions against a foreign sovereign absent an explicit waiver, the FSIA does not provide

16

a U.S. court with the power to enter enforceable contempt orders against a foreign state.[8]

      *Third*, the Order is improper because the Republic cannot comply with its terms. *See Armstrong v. Guccione*, 470 F.3d 89, 99-100 (2d Cir. 2006) ("While the court [will not relitigate the basis upon which an] enforcement order [rests], it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action.") (bracketed text in original, internal citations omitted). Here, whatever the situation was when the Injunctions were entered and affirmed, it is now clear that the Republic cannot comply "completely with the February 23, 2012 injunction," as the Order requires. Order at 3 (Ex. A). There is a total of approximately $10 billion in claims on defaulted debt pending in the district court alone, and another approximately $10 billion pending in other jurisdictions or not yet subject to suit. The Republic – whose reserves stand at approximately $31 billion and must be used for critical macroeconomic purposes – simply cannot afford to pay the holders of its defaulted debt in full under the district court's application of the *pari passu* clause.

      This is not a theoretical concern. In the last eight months, the

---

[8]    There may be an exception to this rule where the sanction is an adverse inference relating to the merits of an ongoing litigation, but that possibility is inapplicable here, nor did the district court purport to rely on it.

17

Republic has been served with thirty-five complaints by plaintiffs seeking, on claims totaling nearly $6 billion (not counting post-judgment interest or any interest on pre-judgment claims), the same *pari passu* relief that the district court granted plaintiffs in these cases. Indeed, NML Capital, Ltd. itself has not only filed two additional motions for summary judgment in the last month seeking *pari passu* relief in connection with approximately *$1.57 billion* of Republic debt (excluding post-judgment interest), *NML Capital, Ltd. v. Republic of Argentina*, No. 14 Civ. 8601 (TPG) (S.D.N.Y. Feb 3, 2015); *NML Capital, Ltd. v. Republic of Argentina*, No. 14 Civ. 8988 (TPG) (S.D.N.Y. Feb. 6, 2015), but has also actively encouraged other creditors to maximize the number of claims against the Republic, making the impossibility of complying with the Injunctions even more obvious, Letter from R. Cohen to J. Griesa, Dec. 23, 2014 (ECF No. 727) (referring to letter describing "the organizing principles by which plaintiffs *in more than 100 actions* pending before [the district court] intend to seek *pari passu* injunctions similar to that granted to NML") (emphasis supplied). Plaintiffs' proposal to increase by many billions the total amount of claims subject to injunctive relief further demonstrates the inefficacy of the Injunctions and the impossible situation in which they put the Republic.

Plaintiffs' arguments regarding the merits of the Republic's claim of immunity are thus both premature *and* wrong.

18

## CONCLUSION

For the foregoing reasons, the Republic respectfully requests that the

Court deny plaintiffs' Motion.

Dated: New York, New York
        February 26, 2015

                          Respectfully submitted,

                          CLEARY GOTTLIEB STEEN & HAMILTON LLP

                          By:      /s/ Carmine Boccuzzi        

                              Jonathan I. Blackman (jblackman@cgsh.com)
                              Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

*Of Counsel:*

Jacob H. Johnston           One Liberty Plaza
                            New York, New York 10006
                            (212) 225-2000

                            *Attorneys for the Republic of Argentina*

# EXHIBIT A

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #: _____     │
│ DATE FILED: _10/3/14_        │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
                         :

NML CAPITAL, LTD.,             :

                 Plaintiff,   :

                         :      08 Civ. 6978 (TPG)

      – against –           :      09 Civ. 1707 (TPG)

                         :      09 Civ. 1708 (TPG)

THE REPUBLIC OF ARGENTINA,   :

                         :

               Defendant.   :

                         :

------------------------------------------x
                         :

AURELIUS CAPITAL MASTER, LTD. and   :
ACP MASTER, LTD.,

                         :      09 Civ. 8757 (TPG)

               Plaintiffs,   :      09 Civ. 10620 (TPG)

                         :

      – against –           :

                         :

THE REPUBLIC OF ARGENTINA,   :

                         :

               Defendant.   :

------------------------------------------x
                         :

AURELIUS OPPORTUNITIES FUND II,   :
LLC and AURELIUS CAPITAL MASTER,   :
LTD.,                        :      10 Civ. 1602 (TPG)

                         :      10 Civ. 3507 (TPG)

               Plaintiffs,   :      10 Civ. 3970 (TPG)

                         :      10 Civ. 8339 (TPG)

      – against –           :

                         :

THE REPUBLIC OF ARGENTINA,   :

                         :    **(captions continued on**

               Defendant.   :      **next page)**

                         :

------------------------------------------x

```
--------------------------------------------x
                                            :
BLUE ANGEL CAPITAL I LLC,                   :
                                            :
                        Plaintiff,          :        10 Civ. 4101 (TPG)
                                            :        10 Civ. 4782 (TPG)
          – against –                       :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
                        Defendant.          :
                                            :
--------------------------------------------x
                                            :
OLIFANT FUND, LTD.,                         :
                                            :
                        Plaintiff,          :        10 Civ. 9587 (TPG)
                                            :
          – against –                       :
                                            :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
                        Defendant.          :
                                            :
--------------------------------------------x
                                            :
PABLO ALBERTO VARELA, et al.,               :
                                            :
                        Plaintiffs,         :        10 Civ. 5338 (TPG)
                                            :
          – against –                       :
                                            :
                                            :
THE REPUBLIC OF ARGENTINA,                  :
                                            :
                        Defendant.          :
                                            :
--------------------------------------------x
```

2

Case 1:08-cv-06978-TPG   Document 693   Filed 10/03/14   Page 3 of 3

## AMENDED AND SUPPLEMENTAL ORDER

On September 29, 2014, pursuant to an order to show cause, the court held a hearing, at the conclusion of which it found that the Republic of Argentina was in civil contempt of court. The reasons for this finding were stated on the record.

The court now reaffirms this finding, and incorporates it by reference in this order.

Pursuant to Local Civil Rule 83.6(c), a finding of contempt should include a statement of conditions the performance of which will operate to purge the contempt. The court believes that it is clear what such conditions are. The Republic of Argentina will need to reverse entirely the steps which it has taken constituting the contempt, including, but not limited to, re-affirming the role of The Bank of New York Mellon as the indenture trustee and withdrawing any purported authorization of Nación Fideicomisos, S.A. to act as the indenture trustee, and complying completely with the February 23, 2012 injunction.

The current order amends and supplements the order of September 29, 2014.

SO ORDERED.

Dated:  New York, New York
      October 3, 2014

Thomas P. Griesa
U. S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/3/14

3

# EXHIBIT B

E9t9repc

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    NML CAPITAL, LTD., et al.,

 4                   Plaintiffs,

 5         v.                              08 CV 6978 (TPG)

 6    THE REPUBLIC OF ARGENTINA,

 7                   Defendant.

 8    ------------------------------x

 9                                         New York, N.Y.
                                           September 29, 2014
10                                         3:12 p.m.

11    Before:

12                    HON. THOMAS P. GRIESA,

13                                         District Judge

14                    A P P E A R A N C E S

15    DECHERT LLP
           Attorneys for Plaintiff NML Capital, Ltd.
16    BY:  ROBERT A. COHEN

17    FRIEDMAN KAPLAN SEILER & ADELMAN LLP
           Attorneys for Interested Parties Aurelius Capital Partners
18         and Blue Angel
      BY:  EDWARD A. FRIEDMAN
19             DANIEL B. RAPPORT

20    GIBSON DUNN & CRUTCHER
           Attorneys for Plaintiff NML Capital, Ltd.
21    BY:  JASON J. MENDRO

22    GOODWIN PROCTER
           Attorney for Plaintiff Olifant Fund
23    BY:  ROBERT D. CARROLL

24    CLEARY GOTTLIEB STEEN & HAMILTON
           Attorneys for Defendant
25    BY:  CARMINE BOCCUZZI
               JONATHAN I. BLACKMAN
```

E9t9repc

1        (In open court; case called)

2        THE COURT:  Mr. Cohen, I think it's your motion.

3   Would you like to speak to the motion.

4        MR. COHEN:  Thank you, your Honor.

5        Robert Cohen from Dechert speaking today on behalf of

6   NML Capital and the other movants.  Your Honor, we're here this

7   afternoon on a motion brought on by order to show cause seeking

8   that Argentina be held in contempt for its

9   continuing violations of this Court's orders and that

10  appropriate sanctions be imposed to coerce Argentina to come

11  into compliance with those orders.

12       Your Honor, this motion is not seeking sanctions to

13  compel Argentina to pay the money that is owed and that is

14  subject to your Honor's amended February 23 order as Argentina

15  has suggested it in its opposition papers.  This motion is

16  designed to address the concerns that the plaintiffs have that

17  Argentina is and will continue to act in violation of what we

18  call the anti evasion portion of the amended February 23 order

19  by continuing to take steps to find ways to get around that

20  order.

21       If I may, your Honor, I'd like to recount for you the

22  steps we think Argentina has taken through as recently as last

23  week and remind your Honor of the directions and orders that

24  you have given in an attempt to address those violations and to

25  remind your Honor that you have, in fact, already found that

1    all of the things that I am going to describe were in violation

2    of your Honor's orders.  We're not asking for new findings.

3    Your Honor has already found that.

4         I also would like to address, your Honor, the concern

5    that you have expressed in the past and that we take very

6    seriously; that an order of contempt might have the effect of

7    driving Argentina away from the settlement table.  It's our

8    fond hope that we will eventually be able to negotiate a

9    settlement of this dispute.  But we know from the past three

10   months, since Special Master Pollack was appointed, that those

11   efforts have been unavailing and, in fact, your forbearance has

12   resulted only in Argentina repeatedly taking steps to violate

13   your orders.

14        Your Honor, the most recent violation, the one that

15   happened last week, was a "legal notice" published in the New

16   York Times, in the Wall Street Journal and other papers that

17   announced that Argentina had stripped Bank of New York of its

18   ability to conduct business in Argentina and invited exchange

19   bondholders to take steps to remove Bank of New York as the

20   trustee for the exchange bonds.  That, we contend, your Honor,

21   was a direct violation of your order which prevents Argentina

22   from taking steps to violate the anti evasion provision.

23        Your Honor, Argentina's violations go back well more

24   than a year.  What happened right after the Second Circuit

25   affirmed your Honor's order, the amended February 23 order, in

E9t9repc

1    August of last year, was that the President of Argentina went

2    on television in Argentina and announced that a plan was going

3    to be developed to evade this Court's order, to allow exchange

4    bondholders to receive payment on their bonds in Argentina.

5            THE COURT:  To do what?

6            MR. COHEN:  To receive payment, interest payments on

7    their bonds rather than through Bank of New York and New York

8    but rather in Argentina, to avoid the jurisdiction of this

9    Court.

10           You responded promptly, your Honor, and issued a

11   direction that said any such steps would be an evasion of this

12   Court's order and must not happen.

13           In June of 2014 when the Supreme Court denied

14   certiorari on Argentina's petition seeking review of the

15   amended February 23 order, Argentina's economy minister again

16   declared a nearly identical plan:  Come to Argentina, get new

17   bonds, and we'll pay you in Argentina.  He said to the exchange

18   bondholders:  We must avoid the orders of the District Court in

19   New York.

20           Then at the end of June, your Honor -- I'm sorry.

21   Your Honor, you issued an order right after that statement that

22   said any such plan would be a violation of the amended

23   February 23 order.  Of course, your Honor, the keystone of the

24   amended February 23 order is that if Argentina chooses to pay

25   the exchange bondholders -- doesn't have to but if it chooses

 1   to -- it must pay the plaintiffs in this case rateably, at the

 2   same time or before.

 3           Notwithstanding that very clear order, your Honor, at

 4   the end of June Argentina purported to make a payment on the

 5   exchange bonds without paying the plaintiffs in this case.

 6   Fortunately, Bank of New York, who was the trustee, acted

 7   appropriately, obeyed this Court's orders and refused to pass

 8   along that money to the exchange bondholders.

 9           But Argentina, in defiance of this Court's orders and

10   in define of representations made to the Supreme Court that it

11   would obey this Court's orders if certiorari was granted,

12   immediately violated that order by attempting to make the

13   payment without paying the plaintiffs in this case.

14           Since then, Argentina has instructed Bank of New York

15   to pass along the money that this Court has ordered that Bank

16   of New York hold.  They wanted Bank of New York to pass that

17   money along to the exchange bondholders.  And it's taken out

18   full-page ads instructing Bank of New York to act in such a

19   fashion.

20           On August 19 of this year, again, the President

21   announced that it was going to enact legislation to allow the

22   exchange bondholders to come to Argentina and get their money

23   and defy this Court's orders.

24           Emergency hearing was held two days later and your

25   Honor said that must not happen.

E9t9repc

1        Despite that instruction, on September 12 -- I believe

2   it was -- September 12 of this year, legislation was enacted in

3   Argentina that had the effect of removing Bank of New York or

4   purporting to remove Bank of New York and to provide a

5   mechanism for exchange bondholders to get paid.

6        If I may, your Honor, just read a small portion of the

7   legislation that was enacted.  I'm reading from the publication

8   of the law that was in the Official Gazette of the Argentine

9   Republic.  It's Exhibit 38 to my declaration in support of this

10  motion.

11       It's a law captioned "Sovereign Payment Debt

12  Restructuring."  Chapter 1 is captioned "Local Sovereign

13  Payment of the Foreign Debt of the Argentine Republic.  And

14  Chapter 2 says, "The means to safeguard receipt of payment by

15  the holders who joined the 2005 2010 sovereign debt

16  restructuring."  And it says in part, "The implementing

17  authority for this law shall be authorized to adopt the

18  necessary measures to remove the Bank of New York Mellon as

19  trustee and appoint Nacion Fideicomisos SA in its stead."

20       Your Honor, what this law says is they're going to

21  remove Bank of New York and appoint an entity that is an

22  affiliate of a bank that is a hundred percent owned by

23  Argentina, in Argentina to act in effect as trustee on the

24  bonds.

25       Your Honor, it's our submission that the cumulative

E9t9repc

1   effect of these actions is indisputably a contemptuous and

2   punishable --

3           THE COURT:  Can I interrupt you.

4           What is proposed, as I understand it, is to remove

5   Bank of New York Mellon as the indenture trustee and appoint

6   somebody else in Buenos Aires -- I don't know what they would

7   call them -- but anyway to do the necessary, let's say, in

8   Buenos Aires.

9           MR. COHEN:  Yes, your Honor.

10          THE COURT:  I further understand that this is really

11  contained in one of these legal notices that the new

12  official -- this is in the notice -- has obligations to

13  distribute the amounts paid; in other words, the interest would

14  then be paid in Argentina.

15          Now, it's also my understanding -- and maybe this goes

16  too far -- that really the proposal is to move the operation --

17  let's call it the operation of the -- what is necessary about

18  the bonds from New York to Argentina.

19          Is that something you -- am I saying something correct

20  or what do you --

21          MR. COHEN:  I think that is the objective of the new

22  law, to find a mechanism by which exchange bondholders could

23  come and get -- come to Argentina and get paid.  They also

24  would be able to exchange their bonds for new bonds, issued in

25  Argentina and payable in Argentina.  That is what the law

E9t9repc

1      contemplates.

2                  THE COURT:  You go ahead with what you were speaking

3      of.  Thank you.

4                  MR. COHEN:  Your Honor, I'd like to address the legal

5      standard that your Honor needs to consider in deciding whether

6      it's appropriate at this point to hold Argentina in contempt.

7                  The standard is, I think, easily met here.  If there's

8      an order that's been violated and it's clear and unambiguous,

9      and the proof of noncompliance is clear and convincing, and the

10     violator was not reasonably diligent in attempting to comply,

11     then the standard for contempt is met.  I don't think there's

12     much argument here that all of those standards are easily met.

13                 But there is an issue, I think, that lingers here and

14     that is whether there is anything in the Foreign Sovereign

15     Immunities Act that could restrict your Honor's ability to

16     issue a contempt order and impose a sanction.

17                 I think the answer is no.  There is -- the weight of

18     authority, cases that have considered whether or not district

19     courts have the authority, the inherent authority to issue

20     sanctions, find findings of contempt and issue sanctions

21     against sovereigns is that they do.  Our brief lists I think

22     fifteen or so cases, district court, court of appeals cases

23     where sovereigns have been held in contempt and sanctions have

24     been imposed on them.

25                 Argentina in its opposition argues that there's an

1   international law precept that applies here.  They cite --

2           THE COURT:  A what?

3           MR. COHEN:  An international law concept, a

4   convention.  It's a convention that is not enforceable.  It's a

5   convention that the U.S. is not a party to.  And it has no

6   bearing on this case.

7           They argue that the United States government has

8   supported the position that district courts do not have the

9   authority.  We cite five cases in which the U.S. Government has

10  appeared as amicus, expressed those views, and the courts have

11  said they need to -- they need not consider them.  The district

12  court -- I'm sorry.  The Court of Appeals for the District of

13  Columbia specifically said those views can be disregarded.

14          Your Honor, the Supreme Court recently in this case

15  advised -- held that the Foreign Sovereign Immunities Act goes

16  no further than the words it contains.

17          You may remember, your Honor, you found that you had

18  the authority to order discovery with respect to a sovereign's

19  assets anywhere in the world.  Argentina argued that that was

20  beyond the scope of the FSIA and the government supported that

21  argument.

22          The Supreme Court in a decision by Justice Scalia said

23  you look to the statute.  If it doesn't restrict the district

24  court's authority, there is no restriction.  And went on to say

25  that the FSIA replaced the prior way in which foreign sovereign

E9t9repc

immunities decisions were made; that is, the executive could
weigh in and deference was given to the sovereign's views.
Justice Scalia said that ended 40 years ago.  The statute's the
statute.  And the views of the executive branch don't carry any
weight.

The Second Circuit has tacitly approved the issuance
of sanctions, monetary sanctions against the sovereign in the
Rafadain case in which a sanction had been imposed.  The
sovereign sought to have that sanction vacated and the Second
Circuit affirmed.

But there are many district court judges in this court
who have imposed monetary sanctions against sovereigns, and not
just in the discovery context.  For some reason Argentina
thinks that the discovery context cases don't carry much
weight.  We're not sure why that should be the case.  When a
party defies the court's orders with respect to discovery, it's
every bit as defiant as a failure to follow a court's orders in
some other context.

There are sanctions imposed, for example, when a party
reinstated board members of a company when the court had
removed them; issued an injunction removing board members and
it issued sanctions until those board members were removed.

In a case called Chabad, in the District Court in the
District of Columbia, the sanction was imposed because the
Russian Federation failed to turn over some artifacts that were

1   the subject of an injunction to be delivered to the plaintiff

2   in that case and imposed monetary sanctions.

3            In those cases, your Honor, the sanction was $50,000 a

4   day, which is what we suggest is the appropriate sanction here.

5   The question your Honor may be asking is:  If I do this am I

6   really going to advance the ball much?  Am I going to

7   jeopardize any settlement discussions?  Is it the right thing

8   to do at this time?

9            And our view is that it's the right thing because

10  having refrained from issuing sanctions hasn't really worked.

11  We don't think it's going to get worse if you issue sanctions

12  because it's hard to imagine how it could get worse.

13           Common sense suggests that if the Court exercises its

14  authority, holds a party to its commitment to have its disputes

15  resolved in this court, participates in the litigation, loses,

16  has orders imposed, the Court needs to take steps, whatever

17  those steps may be, to assure that those parties respect the

18  orders of the court.

19           Argentina may or may not pay the sanctions.  We hope

20  they will.  But if they don't, your Honor, we may have to

21  suggest other nonmonetary sanctions that may coerce Argentina

22  into acting appropriately.

23           We also think it's important, your Honor, that you

24  take these steps now because there are a whole number of third

25  parties who are involved in the payment stream who are watching

1   what's happening.  We think it's very important that this Court

2   show that people may not ignore this Court's orders with

3   impunity.  And it would be an important step.

4           THE COURT:  Let me ask you this.  We all know that

5   there can be orders issued by a court and the party against

6   whom the order is issued doesn't comply and then the Court

7   directs compliance or whatever.  It is very seldom that you get

8   any issue about contempt of court, although there's certainly

9   many instances that any judge has where there can be failure of

10  compliance and a need to have some remedy.

11          Why does this situation now, in your view, justify

12  raising the level of whatever you call it to a contempt of

13  court?

14          MR. COHEN:  Your Honor, because the repeated

15  violations of explicit directions to act or not to act in a

16  particular way have been ignored.  Repeatedly.

17          You may not pay the exchange bondholders without

18  paying the plaintiffs.  They did that.

19          You may not enact legislation.  You may not take steps

20  to evade this Court's orders.  They've done that.

21          The idea that merely doing as you have done with great

22  patience in the hope that they will respect this Court's orders

23  and that settlement will happen has simply not occurred.

24          And the Court, we believe, should use its power and

25  authority to take steps to tell Argentina that it can no longer

1  act that way.  And the way that courts do that when they get to

2  the point where you have a party who simply refused to obey is

3  to impose sanctions; find them in contempt and hold sanctions.

4      We think we have been more than patient with

5  Argentina.  We have representations from counsel that there are

6  no such plans, nothing will happen, they're coming next week to

7  negotiate, all of which has, in fact, turned out not to be

8  true.

9      I think it's time for the Court to exercise its

10  authority and to tell Argentina that it really needs to change

11  its behavior.

12      THE COURT:  Thank you very much.

13      MR. BOCCUZZI:  Good afternoon, your Honor.  Carmine

14  Boccuzzi, Cleary Gottlieb, for the Republic of Argentina.

15      As your Honor mentioned, contempt sanctions are very

16  seldom, in the extreme situation.  And we do not believe that

17  they're warranted here either as a matter of law or the record

18  that your Honor has before you.

19      Just to take a step back and talk about where we are

20  in terms of the facts.  The injunctions have, in fact, operated

21  and continue to operate as the plaintiffs intended them to

22  operate.  The exchange bondholders have not received their

23  payment.  And so the equal treatment that the plaintiffs wanted

24  is, in fact, the rule of the day.

25      And to answer some of Mr. Cohen said, there have been

1    attempts -- your Honor is aware of them -- to resolve them.

2    But it's, as we've discussed in the past, a huge and difficult

3    problem.  The pari passu injunction, obviously their logic

4    applies across the board.  And your Honor has been seeing the

5    me-too applications coming in, the billions of dollars of

6    claims and judgments that are being asserted by folks holding

7    those claims and judgments saying me too, I get that too.  You

8    couple that with the existence of the so-called RUFO clause,

9    which doesn't sunset until the end of the year, and we have

10   quite an intractable problem facing us.

11          Contempt is meant in this context, in the civil

12   context, to coerce or to compensate.  It's not meant to punish.

13   And here the point is you're supposed to enter a sanction of

14   the kind that plaintiffs are demanding if, in fact, that could

15   coerce some result.

16          I don't see that as happening here.  And what I think

17   what's going on is plaintiffs want to punish Argentina.  But

18   that's not appropriate.

19          The way you see the punishment is that most of the

20   items on their list that Mr. Cohen recounted for you of

21   transgressions or alleged transgressions are things that

22   happened in the past.  And they are things that are speeches by

23   the president of Argentina or members of her cabinet.

24   Obviously, again, I think it's common ground.  This is a huge

25   situation for the Republic that it has to deal with as a

1    sovereign state. It has macroeconomic ramifications. And so

2    just a politico or a speech or a bill or a law or an attempt by

3    a sovereign to deal with that can't be seen as something that

4    contempts can be ordered for.

5         Again, getting back to where things stand, the

6    exchange bondholders have not obtained their money. And so

7    Mr. Cohen, I think, is ignoring. We've said that as a matter

8    of law this is an extreme sanction when you think about it in

9    the context of international law and practice, when you think

10   about it in the context of the FSIA. Because it's really

11   targeted at those quintessential sovereign acts: Speeches,

12   legislation, as opposed to an actual evasion by the Republic of

13   Argentina.

14        THE COURT: Well, you know, I don't think that covers

15   the whole ground. I'm really glad to have this opportunity to

16   discuss this with you because we have not had such an

17   opportunity before. But what you -- as I understand it what is

18   proposed is to displace the indenture trustee and appoint

19   somebody in Buenos Aires and that that party, that official

20   will then pay the interest due to the exchanges of 2005 and

21   2010 without any recognition of the nonexchanges and so forth.

22   That's the problem.

23        It isn't rhetoric. It seems to me there's a very

24   concrete proposal to -- that would clearly violate the

25   injunction. So what I'm faced with is, unless you correct me,

1   is a violation of the injunction in very concrete terms.

2              I'm not worried about rhetoric.  But I'm worried about

3   violations.

4              Go ahead.

5              MR. BOCCUZZI:  Thank you, your Honor.

6              As to that, again, we have to talk about clear and

7   convincing evidence of a violation that has occurred.  Bank of

8   New York, in response to the legal notice, has informed the

9   Republic that it remains as trustee and will not cease being

10  the trustee until there's an order from this court saying it is

11  no longer the trustee.

12             Your Honor specifically entered paragraph four of the

13  amended injunctions, the so-called anti evasion provision, to

14  have something in place that third parties would look to if

15  there was an attempt to change the payment mechanism or do

16  other things.  And we've seen again and again over the course

17  of the summer the third parties who have been in this courtroom

18  because they're not making a move unless they get a green light

19  from your Honor.

20             And so if you look at what they're asking for, they're

21  saying enter this order, find the Republic in contempt, order

22  hundreds of thousands of dollars, millions of dollars per year

23  in penalties, even though this case is all about the inability

24  of the Republic to pay their claims.

25             And so what they're asking your Honor is to add more

E9t9repc

1    money on top of that for something that's saying -- has not yet

2    happened but that they're afraid is going to happen.

3            Your Honor has said if the payment mechanism changed,

4    if there are different bonds the pari passu injunctions would

5    bite in effect any additional payment.  So we're talking about

6    a lot of things in futuro.

7            And really for the contempt sanction they've got to

8    hone in on a violation that can be purged.  And here there is

9    nothing that I can see that they have identified that can be

10   purged subject to the contempt sanction.

11           I really think what's going on here -- because this is

12   not the first time they've come in.  Now they've made an actual

13   motion.  They have a declaration.  In the past they sent your

14   Honor letters, which is an improper procedure, saying give us

15   contempt.  And they wanted to do that since the Supreme Court

16   denied cert back in June.  And there was no basis for it then

17   and there is no basis for it now.

18           Obviously, they think it will be something good for

19   them to trump it and to put in their own advertisements and

20   their own rhetoric against the Republic, but I don't think that

21   is a proper exercise of the contempt power, putting aside the

22   threshold legal arguments that we've raised.  It will only make

23   the situation worse.  It will not help the situation at all in

24   terms of, hopefully, a resolution.  Again, it doesn't help when

25   the state of play -- state of play is that the injunctions have

E9t9repc

1    been functioning.

2           So, I really want to take a step back.  We've gotten

3    where we've gotten.  Obviously, we have a large problem.  We're

4    really in the land of an unprecedented situation.  This has not

5    happened before in the context of a sovereign debt

6    restructuring.

7           These injunctions affect not just the Republic of

8    Argentina and its citizenry but it goes beyond to holders of

9    the performing debt, to the financial institutions, we've seen

10   are caught in the middle of this.

11          THE COURT:  Let me interrupt.

12          When the Republic made the exchange offers in 2005 and

13   2010 most people accepted.  So you have a lot of exchange bonds

14   and interest due on those bonds.

15          Now, it wasn't compulsory.  Everybody did not accept.

16   And so what you were left with is a situation where a lot of

17   people have new bonds and they have certain assurances that

18   accompany those new bonds and so forth.

19          Then you have the people who did not accept.  The

20   problem that has existed for a long time is this.  It seems to

21   me that if the Republic had been responsible, the Republic

22   would have recognized that there was a problem here, and there

23   was a problem:  How to deal with the people who did an

24   exchange.  Not easy.

25          But the problem was exacerbated because what should

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    have been done is that the Republic goes to representatives of

2    those people who did an exchange and tries to start working

3    something out.  Problems have existed harder than that.  And

4    instead of doing that, the Republic, in all kinds of rhetoric

5    and so forth simply said:  We're not going to recognize.  We're

6    not going to pay.  We're not going to deal with that.  That's

7    what has created the problem; to take a very important and

8    substantial amount of debt and try to say it doesn't exist and

9    we won't pay it and we call it vultures and all of that.

10         Why didn't the Republic say we have something to work

11   out?  Why didn't they do that instead of doing everything

12   opposite to that that they could think of?  That's the thing

13   that is bothersome.

14         MR. BOCCUZZI:  The Republic, your Honor, I believe did

15   act responsibly.  Let's not forget it took two debt

16   restructurings.  They got 92 percent.  The problem was there

17   was so much defaulted debt.  That still leaves the claims of

18   these folks.  And it's a lot.  It's six billion in principal

19   only.

20         But that's not the result of the Republic acting

21   irresponsibly.  That's the result of having a tragic financial

22   and economic collapse in 2001.

23         THE COURT:  You're not addressing my question.

24         MR. BOCCUZZI:  But to get to that any need now to deal

25   with this problem is -- we're talking about $20 billion in

E9t9repc

1    defaulted principal and interest.  And we're talking about the

2    RUFO clause that prevents any offer to that group until its sun

3    sets.

4            And so when we asked the Court back in June for more

5    time and these folks who told you a few years ago that time was

6    on their side, they'd be here for decades, all of a sudden six

7    months was too long.  And so we're hamstrung.

8            THE COURT:  I do not understand what you're saying

9    now.

10           MR. BOCCUZZI:  The point is -- the point is, your

11   Honor, I'm just trying to refocus a little bit.  Your Honor had

12   mentioned the Republic, how it had acted.  And I was trying to

13   explain how it has been acting responsibly in the wake and as a

14   result of this financial collapse and a lot of defaulted debt

15   and the constraints on it.  And the constraints on it are the

16   number of folks out there who are or who will demand pari passu

17   rights, the existence of its contractual restrictions on the

18   performing debt and just the timing situation we find ourselves

19   in.

20           This problem -- I just don't want it to be seen as, as

21   your Honor had said, acting responsibly or irresponsibly.  The

22   Republic has acted as a responsible sovereign in trying to deal

23   with this situation and continues to try to act that way.

24           This case has obviously attracted the attention of

25   bodies throughout the world.  There's a U.N. resolution

E9t9repc

1    concerning the need to come up with orderly debt resolution

2    processes.  We mentioned that.

3           The reason why we mentioned that is to show the keen

4    sovereign interests at stake here and what it is we're dealing

5    with in the context.  Because the context of today's motion is

6    that these folks want a finding of contempt, which is a very

7    serious thing.  They want it found against a sovereign.  And

8    they want daily fines imposed, a huge amount of money when

9    we're already talking about a huge amount of money that the

10   Republic has been trying to deal with.

11          And so in terms of the issue on the table today, I

12   would say that in the past your Honor has managed the

13   situation.  When the June payment was made to Bank of New York,

14   your Honor said Bank of New York hold on to the money in your

15   account in Buenos Aires and there the money stays.  So your

16   Honor's injunctions have functioned the way they were set up to

17   function.  And they're so -- so I don't think the purging

18   mechanism, to impose a fine on the Republic, find it in

19   contempt until something changes doesn't make sense here

20   because the injunctions have, in fact, bit and these folks are

21   not getting their money while these folks don't get their

22   money.

23          So with that, your Honor, unless you have questions I

24   would end with that point.  But I just think at the end of the

25   day contempt on this record, apart from being legally

1    inappropriate, is just going to make matters worse.  And your

2    Honor has kept an even keel to date and I would respectfully

3    ask that we continue in that frame and not make matters worse.

4            THE COURT:  Thank you.

5            MR. COHEN:  May I briefly respond?

6            THE COURT:  Yes.

7            MR. COHEN:  Your Honor, Mr. Boccuzzi suggests that the

8    sanctions we're asking for are designed to compel Argentina to

9    pay amounts that it simply can't pay.  That's taking the eye

10    off of the ball that we are asking your Honor to consider.  We

11    want Argentina to stop taking steps to evade the order.  It's a

12    little ironic for counsel to argue that the injunction is

13    working notwithstanding his client's attempts to evade it.

14    We're lucky that we have Bank of New York who has refused to

15    comply.  They have violated the orders.  They just didn't get

16    away with it.

17            Your Honor, with respect to Bank of New York -- I

18    don't know if counsel has read the September 22 notice that was

19    in the Times, but it makes it clear that Argentina has taken

20    steps to make it impossible for Bank of New York to act as

21    trustee.

22            If I could just take a minute to read it.  It says,

23    "Indeed by means of Resolution No. 437 of the Central Bank of

24    Argentina on August 25, the authorizations granted to the two

25    individuals who until then acted as sole representatives of

E9t9repc

Bank of New York Mellon in Argentina were revoked.  Therefore, since Bank of New York Mellon is neither licensed by the Central Bank to operate as a financial institution in Argentina, nor is it otherwise registered to render services as trustee, nor is it duly authorized to act through local representatives, said bank does not have a trustee or representative office in Argentina as required under Section 5.8 of the trust indenture and accordingly it has ceased to be eligible to serve as trustee."

They have taken steps to make it impossible for Bank of New York to act as trustee.

What we would like as a sanction, that is what we would like to see as a way to cure the contempt, is to reinstate Bank of New York as the trustee.

Now, that has nothing to do with paying us the money that's owed to us.  It goes to the core of the injunction, and it will eliminate the ability, at least in one way, to evade that if Bank of New York is back in place.

There's a payment due tomorrow, your Honor.  September 30 there's a payment due.  Are they going to pay Bank of New York Mellon as trustee?  Are they going to pay this entity in Argentina even though they don't pay us?

Your Honor, this is a very serious matter.  We think sanctions are absolutely required to prevent the continued acts of contempt that we are seeing from Argentina.

E9t9repc

1          THE COURT:  Thank you all very much.  Any other

2    attorney wish to --

3          MR. BOCCUZZI:  May I just address that point, your

4    Honor?

5          THE COURT:  Please do.

6          MR. BOCCUZZI:  The Bank of New York has responded

7    to -- two points.

8          One.  To be clear, the representative office of the

9    Bank of New York in Argentina is not the entity that performs

10   the trustee functions.  That's performed out of New York, as I

11   understand it.

12         Number two.  The Bank of New York has responded to the

13   legal notice and they've informed the Republic of Argentina

14   that they, in their view, are still the trustee and they will

15   continue to perform all of its obligations under the indenture

16   and governing law.  And so in doing so cannot risk contempt by

17   defying the plain import of the injunctions.

18         So, what Mr. Cohen just said is very much disputed by

19   the Bank of New York.  And, again, I think the sanction he's

20   asking for doesn't work there.

21         THE COURT:  All right.  Let me put my ruling on the

22   record.

23         Plaintiffs have moved to hold the Republic of

24   Argentina in civil contempt of court and has moved also for the

25   Court to impose sanctions.

1          The Court holds that the Republic of Argentina is in

2     civil contempt of court.  As far as the sanctions, the Court

3     will reserve decision on that for further proceedings.

4          What is the reason for the ruling I have made?

5          The legal framework setting out the obligations of the

6     various parties in this matter is contained in the February 23,

7     2012 injunction.  I will not take time to go over the terms of

8     that.  I will assume knowledge on the part of the lawyers here

9     and access to the information by others.

10          The problem is that the Republic of Argentina has been

11     and is now taking steps in an attempt to evade critical parts

12     of that February 23 order.  That order is clear beyond question

13     that the Republic can only make payments of interest to its

14     exchange bondholders if it makes an appropriate payment to

15     those who did not exchange.  That is the terms of that

16     injunction or order, whatever you call it.

17          Under the terms of what is in place, there is an

18     indenture trustee, Bank of New York Mellon.  Also the

19     proceedings about the bond issue and the exchange bonds are

20     essentially to be in New York.  And when the bonds were

21     originally issued it was, of course, held out that if there

22     were defaults, if there were problems, matters could come

23     before a court in New York.  This was a selling point.  People

24     knew that they would not have to go to Buenos Aires if there

25     was a problem.

E9t9repc

1    What the Republic of Argentina is attempting to do now

2    is essentially move the proceedings about the bonds to Buenos

3    Aires.  And the purpose is to act in certain ways that are a

4    violation of the February 23 injunction.  But the attempt is to

5    get a new trustee, a new location, so that the Republic can

6    make payments that are not authorized by the injunction.  That

7    is what is going on.  Documents, statements, all show exactly

8    what I am talking about.

9    I should be a little more specific about one point.

10   Maybe I've covered it, but I'll repeat.  A very important

11   aspect of the February 23 injunction is that if and when the

12   Republic seeks to pay interest to the people have exchanged

13   bonds, then an appropriate payment must be made under what is

14   called the pari passu clause to those who did not exchange.

15   So the Republic has two basic obligations:  One, to

16   the exchangers and one to the people who did not exchange.  And

17   both have to be dealt with.  One cannot be ignored or denied as

18   to dealing with it.

19   But what has happened is the Republic in various ways

20   has sought to avoid to not attend to, almost to ignore this

21   basic part of its financial obligations; that is, obligations

22   to the people who did not exchange.

23   What is now proposed by the Republic is to displace

24   the indenture trustee.  What is proposed is to displace the

25   indenture trustee so that a new official will make the payments

1    that are not allowed under the injunction of this Court and of

2    the Second Circuit.

3              I repeat.  The purpose of displacing the indenture

4    trustee and having a new official located in Buenos Aires is so

5    that payments can be made of interest to the exchangers without

6    any payments or any recognition at all being made of the other

7    phase of the obligations; that is, the obligations to the

8    people who did not exchange and who have their bonds, bonds

9    issued by the Republic.

10             What I'm talking about is reflected in various public

11   documents.  It's reflected in the proposed -- actually the

12   actual legislation.  But let me say this.  The legislation is

13   not something that sprung from the national congress.  What

14   we're talking about is proposals and changes and actions that

15   come from the executive branch of the Republic of Argentina.

16             Two things are necessary this afternoon.  One is this

17   Court to make a very clear holding that the proposals are

18   illegal:  The proposal to displace the indenture trustee, the

19   proposal to move the affairs about these bonds to Argentina,

20   move them away from the United States; and the proposal to make

21   interest payments to the exchange bondholders without

22   recognizing the other very important part of the obligations of

23   the Republic and that is obligations to the people who did not

24   exchange and who have the bonds still.  The Court holds and

25   rules that those steps, those proposed steps are illegal and

E9t9repc

1    cannot be carried out.

2            This brings me to the request made by plaintiffs to

3    hold the Republic in contempt of Court, civil contempt of

4    court.

5            We all know, the lawyers here and I know that to hold

6    a party in contempt of court is a rare thing.  I was requested

7    to do so at an earlier stage and declined.  But, the Court is

8    compelled to recognize that what is really the illegal conduct

9    of the Republic involving the attempt to unlawfully change and

10   depart from the provisions of the governing injunction, that

11   conduct and those intentions and purposes are -- they date back

12   a bit but they are going on.  And of course the Court

13   contemplates that the Republic will obey the prohibitions that

14   have just been announced.  But as of the current present time

15   the Republic has been at this, at these attempts to make

16   illegal changes in our structure.  The Republic has been

17   engaged in it to the extent that I do believe that it is

18   appropriate to hold the Republic in civil contempt of court and

19   I so hold.  The reasons I think are evident from what I have

20   said.

21           Now, on the issue of sanctions.  I do not believe that

22   it is appropriate to deal with sanctions this afternoon.  It is

23   perfectly appropriate for a court to hold a party in civil

24   contempt and reserve on sanctions and that is what I am doing.

25   We will work out a means for dealing with sanctions.  And that

E9t9repc

1    I'm sure can be done by some scheduling work among the parties

2    and the court.  But I am reserving on the issue of sanctions.

3              That concludes our proceeding of this afternoon.

4              (Adjourned)